UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X

MARK HARRIS,

                Plaintiff,

    -against-                          **MEMORANDUM & ORDER**

MICHAEL J. ASTRUE,                **07-CV-4554 (NGG)**
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

———————————————————————X

GARAUFIS, United States District Judge:

        Mark Harris ("Plaintiff" or "Harris") brings this action pursuant to 42 U.S.C. § 405(g) of

the Social Security Act to review the final decision of the Commissioner of Social Security

Michael J. Astrue ("Commissioner" or "Defendant") denying Plaintiff's application for disability

insurance benefits. Defendant has moved for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure to affirm the denial of benefits. (Def. Mot. (Docket

Entry #13).) Plaintiff has moved for a reversal of the administrative decision and a remand

solely for the calculation of benefits or, in the alternative, for a remand for further development

of the record. (Pl. Mot. (Docket Entry #14).) For the reasons discussed below, the

Commissioner's Motion is denied, and Plaintiff's Motion is granted to the extent that the

decision of the Administrative Law Judge is vacated and the case is remanded for proper

evaluation of the record.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff filed an application on June 9, 2004 for disability benefits as of October 11, 2003. (Tr. 58-66.) His initial application was denied on September 23, 2004. (See id. at 9-12.) He then requested a hearing. (Id. at 13-14.) On March 7, 2006, Administrative Law Judge ("ALJ") Dennis O'Leary conducted a hearing. (Id. at 410A-35). After the hearing, the ALJ sent interrogatories to a vocational expert, Mr. Rocco Meola, and on March 27, 2006, Plaintiff requested that the ALJ submit additional interrogatories to the vocational expert. (Id. at 50-51.) On January 8, 2007, the ALJ held a supplemental hearing, at which Mr. Meola appeared and testified.[1] (Id. at 398.) On March 26, 2007, Plaintiff amended the period of disability to the interval between October 3, 2003 and March 30, 2006, after which the Plaintiff experienced medical improvement. (Id. at 45.) The ALJ issued a decision on February 16, 2007, concluding that Plaintiff was not disabled from October 3, 2003 through March 30, 2006. (Id. at 5H-5R.)

This decision became final when the Appeals Council denied Plaintiff's request for review on September 7, 2007. (Id. at 5A-5D.) This action followed.

### B.  Plaintiff's Personal and Employment History

Plaintiff was born in 1959 and was forty-four years old when he initially applied for disability benefits. (Id. at 68, 62, 98.) He attended a technical career college where he obtained an associate degree in heating, cooling, and air conditioning systems. (Id. at 417, 88.) Beginning in 1992, Plaintiff worked for companies doing home service, maintenance, and repair. (Id. at 416-17.) From sometime in 2000 to October 2003, Plaintiff worked as a service technician for General Electric Home Appliance and Repair. (Id. at 415-17.) Plaintiff testified

---

[1] The transcript lists the name of the vocational expert who testified at the hearing as a "Dr. Neill." (Tr. 398.) However, it appeared that this is a transcription error because Plaintiff, Defendant and the ALJ all acknowledge that it Dr. Meola was the one who testified at the hearing. (See Pl. Mem. 11; Def. Mem. 4; Tr. 50.)

2

that his job involved bending and kneeling, as well as lifting and moving heavy appliances. (Id. at 82, 415.) On December 1, 2001, Plaintiff injured his lower back on the job, but was able to resume working after two months. (Id. at 417.) On October 11, 2003, Plaintiff slipped on a ramp and fell on some stairs during a service call and injured his left side, lower back, and left leg. (Id. at. 417-18; see also id. at 142-43.) Plaintiff stopped working on that date. (Id.)

### C. Plaintiff's Medical History

#### 1. Treating Physicians

According to the record, Plaintiff saw eight treating physicians and a treating chiropractor. Among them, Dr. William J. Sciales examined Plaintiff initially after the accident. Plaintiff's primary treating physician was Dr. Richard A. Gasalberti, a physician with Sports Medicine and Rehabilitation, P.C., who treated Plaintiff frequently from October 27, 2003 until August 3, 2006, seeing Plaintiff at least once per month throughout most of that period. A chiropractor, Dr. William J. Vendittelli, also treated Plaintiff frequently beginning on December 12, 2003. Plaintiff also saw a number of specialists referred by Dr. Sciales and Dr. Gasalberti, including Dr. Dimitri Kessaries, a urologist; Dr. Mehran Manouel, an orthopedist; Dr. Robert Marini, a pain management specialist; Dr. Ivy Engel, a radiologist; Dr. Kaushik Das, a neurosurgeon; and Dr. Carlisle St. Martin, a neurologist. Their treatment records are summarized chronologically.

After his work-related injury on October 3, 2003, Plaintiff was initially treated by Dr. Sciales. (See id. at 131-33, 157-58.) Dr. Sciales diagnosed lower back derangement and prescribed Vioxx. (Id. at 132, 133, 175, 176.) Dr. Sciales referred Plaintiff to Dr. Kessaries, a urologist, who performed a right hydrocelectomy and a drainage of scrotum on November 13, 2003. (Id. at 346-47; see id. at 325-27.) Dr. Sciales referred Plaintiff to Dr. Gasalberti, a

physician with Sports Medicine and Rehabilitation, P.C., who initially evaluated Plaintiff on October 27, 2003. (Id. at 124-27.), and whose treatment notes are voluminous and highly detailed. (See id. at 120-27, 130-33, 151-52, 182-85, 219-316.)

At his fist visit to Dr. Gasalberti on October 27, 2003, Plaintiff complained of residual low back pain, as well as pain and discomfort in the left foot with numbness, and radicular symptoms to the left lower leg. (Id. at 124.) Dr. Gasalberti concluded from X-rays that Plaintiff had mild degenerative changes with slight increased spurring. (Id.) On examination, Dr. Gasalberti noted positive straight leg raising at 50 degrees and that deep palpation revealed paraspinal spasms at the L3-4 and L4-5 intervertebral discs. (Id. at 126.) Dr. Gasalberti noted that Plaintiff had difficulty toe and heel walking due to pain in the left foot. (Id.) Plaintiff was taking Robaxin, a muscle relaxant. (Id. at 124.) Dr. Gasalberti found a functional range of motion of the hips, knees, and ankles. (Id.) Plaintiff was able to flex his trunk, though with pain. (Id. at 126.) Plaintiff could dorsiflex to a neutral position, plantar flex to 35 degrees, and that inversion and eversion was possible without pain. (Id.)

Dr. Gasalberti noted that Plaintiff had a history of a work-related injury on December 11, 2001 with resultant testicular trauma and hematoma of the testicles requiring surgical drainage (which was performed by Dr. Kessaries on November 13, 2003), and a history of re-exacerbation and lumbar derangement from Plaintiff's October 3, 2003 injury. (Id. at 127.) Dr. Gasalberti ruled out lumbar radiculopathy. (Id.)

Dr. Gasalberti saw Plaintiff again on December 11, 2003. (Id. at 123.) On that date, Dr. Gasalberti noted Plaintiff's straight leg raising was negative, though restricted to approximately 70 degrees. (Id.) Dr. Gasalberti indicated that Plaintiff was totally disabled from prior duties as a truck driver until further notice. (Id.)

4

Plaintiff was referred by Dr. Gasalberti to a chiropractor, William J. Vendittelli, DC, who examined him on December 12, 2003. (See id. at 173-174.) Dr. Vendittelli noted that palpation and percussion were positive at spinal levels L4 and L5. (Id. at 173.) A variety of orthopedic tests for lumbosacral spine impairment were positive. (Id.) He also indicated that on neurological testing, tactile sensation in the upper and lower extremities was within normal limits. (Id. at 174.) He indicated that deep tendon reflexes in the upper and lower extremities were negative, and Plaintiff's gait, heel-walk and toe-walk were within normal limits. (Id.) Dr. Vendittelli reported that lumbosacral X-rays indicated left lateral scoliosis, decreasing in disc height at L4-L5 and L5-S1, subluxation of L4-L5 with right rotation, subluxated pelvis with a superior tilt of the right illium and internal rotation of the left, and sacral base superior on the right. (Id.) Dr. Vendittelli diagnosed Plaintiff with IVD of L4-L5 and L5-S1, left-sided sciatic radiculitis, subluxation complex at L4-L5, L5-S1 and pelvis, and myofascitis of the left lumbosacral paraspinals, left gluteus medius and left hamstring group. (Id.) Dr. Vendittelli recommended spinal manipulation, electrical stimulation, trigger point therapy, hydroculator pads, hydrotherapy and Cox McMannis spinal traction. (Id.)

Dr. Vendittelli also recommended magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine. (See id. at 156.) MRI results from January 2, 2004 showed evidence of a left posterior herniation of the L3/4 intervertebral disc impinging upon the left anterior aspect of the thecal sac, causing moderate stenosis of the left neural foramen. (Id. at 153-154.) The MRI also showed mild dehydration and moderate central posterior herniation of the L4/5 intervertebral disc impinging upon the anterior aspect of the thecal sac. (Id.) It also showed mild stenosis of the spinal canal at L4/5 and dehydration and moderate posterior herniation of the L5/S1 intervertebral disc impinging upon the spinal canal. (Id.) Following this visit, Dr. Vendittelli

treated Plaintiff for two to three times a week for most of the time during the period at issue. (Id. at 167, 422.)

Plaintiff returned to Dr. Gasalberti on January 8, 2004. (Id. at 121-22, 151-52.) Dr. Gasalberti noted that paraspinal spasms were present with deep palpation at L3-L4; muscle testing of the lower extremities was 5/5 and Plaintiff was unable to flex his trunk past 70 degrees due to pain. (Id. at 121.) He reported that examination of the left ankle revealed tenderness over the anterior talofibular ligament and noted fibrous thickening of the plantar fascia of Plaintiff's left foot. (Id.) Dr. Gasalberti requested authorization for acupuncture intervention, pool therapy, and an out-patient formal physical therapy program three times per week. (Id. at 122.) X-rays of Plaintiff's left foot and ankle were taken on January 8, 2004 and showed a small plantar calcaneal spur on the left foot. (Id. at 119, 150.) On January 10, 2004, Dr. Gasalberti had Electromyogram ("EMG") and nerve conduction studies of Plaintiff's lower extremities, from which he found radiculopathy involving the L4-5 and L5-S1 motor roots on the left side. (Id. at 120.)

On January 14, 2004, Dr. Gasalberti referred Plaintiff to Dr. Mehran Manouel for an orthopedic evaluation. (Id. at 128.) Dr. Manouel indicated that Plaintiff had pain in response to palpation over the plantar aspect of the heel and mildly decreased range of motion of the ankle. (Id.) He also noted a fibrotic band along the left arch of the left foot. (Id.) The results of neurovascular examination were in normal limits. (Id.) Dr. Manouel assessed Plaintiff's left foot plantar fasciitis and fibrosis and injected Lidocaine and depomedrol into Plaintiff's left foot heel and arch. (Id.) He noted that Plaintiff had relief of pain after the injection. (Id.) Dr. Manouel prescribed Celebrex and advised physical therapy. (Id.)

6

On January 26, 2004, Dr. Gasalberti saw Plaintiff again. (Id. at 144-45.) His notes from that visit indicate that Patient could flex his trunk to 70 degrees, and had difficulty with toe and heel walking due to pain in his left foot. (Id. at 144.) He also indicated that straight leg raising was negative; deep palpation revealed paraspinal spasms at L3-4 and L4-5; and examination of the left foot and ankle revealed minimal discomfort. (Id.) Dr. Gasalberti recommended continued physical therapy, acupuncture, Vioxx taken daily, and pool therapy, and referred Plaintiff to Dr. Robert Marini, a pain management specialist, to be evaluated for an epidural steroid injection. (Id. at 145.)

Dr. Marini examined Plaintiff on January 17, 2004. (Id. at 196-97.) Dr. Marini noted that Plaintiff ambulated with a mildly flexed gait and that he was taking Vioxx. (Id. at 196.) Dr. Marini noted that Plaintiff had lumbosacral L3-4 left posterior disc herniation with radiculitis. (Id.) Dr. Marini recommended a series of selective nerve blocks, which were administered by Dr. Marini on June 2, June 23, and July 21, 2004. (Id. at 192-94.) He also recommended somatosensory evoked potentials ("SSEPs") of the lower extremities, performed on April 19, 2004, which evidenced a conduction delay along the right/left cervical/lumbosacral spine root. (Id. at 195.)

On February 26, 2004, Plaintiff saw Dr. Gasalberti and reported that he could stand for two to three hours, sit for two to three hours, and lift ten pounds above the shoulders, but he was unable to bend, stoop, crouch, twist, kneel or climb. (Id. at 140.) He also reported that he could not work for more than two to three hours. (Id.) Dr. Gasalberti discontinued the use of Vioxx and prescribed Celebrex. (Id. at 141.) Dr. Gasalberti continued to recommend that Plaintiff wear a lumbar corset for support in addition to the same treatment that he had recommended

7

previously. (Id.) He further indicated that Plaintiff could not perform his prior job and reported that limited light-duty work was not available. (Id.)

Plaintiff again saw Dr. Gasalberti on April 1, 2004 and reported a burning sensation in both thighs. (Id. at 299.) He also reported that he took public transportation, and was "independent in all activities of daily living." (Id.) Dr. Gasalberti's treatment notes from this visit were similar to his notes from Plaintiff's previous visits, with the addition that Dr. Gasalberti noted trigger points of the multifidus muscle. (Id.)

Dr. Gasalberti performed a functional evaluation study on April 6, 2004. (Id. at 275-94.) According to Dr. Gasalberti, Plaintiff had the following degree of impairment: 5% for his left arm; 34% for his left leg; 27% for his left knee; 10% for his left ankle; 14% for his spine; 8% for his cervical region, 7% for his lumbar region, and 0% for his right arm, right hand, and left hand. (Id. at 297.)

Dr. Gasalberti saw Plaintiff again on May 6, 2004 and June 10, 2004, and his treatment records remain largely the same as the records from Plaintiff's prior visits. (See id. at 184-85, 273-74.) Dr. Gasalberti indicated on May 6 that Plaintiff's lateral rotation was 0-15 degrees; manual muscle testing both of lower extremities and trunk flexor/extensors was 5/5. (Id. at 184.) On June 10, Dr. Gasalberti reported mild overall improvement from triggerpoint injections. (Id. at 273.) He also noted that Plaintiff denied radicular symptoms but reported tingling-like sensations in both thighs. (Id.) Dr. Gasalberti indicated that there were no triggerpoints to deep palpation of the lumber paraspinal muscles and Plaintiff's gait pattern was nonantalgic. (Id.) Dr. Gasalberti referred Plaintiff to Dr. Kaushik Das for neurosurgical evaluation and Dr. Carlisle St. Martin for neurological evaluation for a second opinion regarding management. (Id.)

8

On June 15, 2004, Dr. Das performed a neurosurgical evaluation. (Id. at 272.) Dr. Das indicated that Plaintiff had lumbar spasm in the lumbar region; his range of motion was diminished in flexion and extension; and his pain increased when he reached greater than 60 degrees of flexion and 10 degrees of extension. (Id.) But Dr. Das indicated that the evaluation did not reveal any focal abnormalities, straight leg raising was negative, and Plaintiff's gait and coordination were normal. (Id.) Dr. Das noted that Plaintiff's back pain and lumbar radiculopathy were improving with the epidural steroid injection and recommended that Plaintiff have a second injection and continue with physical therapy. (Id.)

Dr. Martin performed neurological evaluations of Plaintiff on June 15, June 30, and July 15, 2004. (Id. at 186-87, 190.) Dr. Martin indicated that the first nerve block performed by Dr. Marini on June 2, 2004 seemed helpful, and scheduled Plaintiff for two additional nerve blocks. (Id. at 187.) He noted that Plaintiff reported that he was awakened by pain at 3 a.m. (Id. at 186-87, 190.) Dr. Martin noted that the results of tibial SSEP performed on June 19, 2004 were abnormal and indicated a pathology originating from the lumbar spine and related nerve root. (Id. at 188-189.) He opined that Plaintiff could not lift over twenty pounds; was totally disabled at that time, and should consider only limited duty work. (Id. at 187.)

Dr. Martin referred Plaintiff to Dr. Ivy Engel, who performed an MRI of the cervical spine. (Id. at 268-69.) Dr. Engel indicated that the MRI result provided no evidence of disc herniation or central spinal stenosis. (Id. at 268.) He also indicated that the MRI showed mild bilateral foraminal narrowing C5/6 and C6/7, and mild cervical spondylosis C5/6. (Id. at 269.) Dr. Martin opined that Plaintiff had lumbar herniated nucleous pulposus and ruled out cervical sprain. (Id. at 190.)

On June 23, 2004, Dr. Vendittelli filled out a summary report for Plaintiff's disability benefits application. (Id. at 166-170.) He stated that Plaintiff must not bend, stoop or lift weight more than twenty pounds; that he could sit for up to eight hours during the workday but must alternate sitting and standing; and that he could stand and walk for up to two hours in an eight-hour workday; and push and pull twenty pounds. (Id. at 169.) Dr. Vendittelli also noted that Plaintiff's response to chiropractic treatment had been satisfactory. (Id. at 167.) In addition, he noted that there was not significant abnormality in Plaintiff's gait. (Id. at 168.)

Plaintiff was then treated by Dr. Gasalberti on July 1 and July 15, 2004. (Id. at 183-184, 265.) The treatment records largely mirror Dr. Gasalberti's previous records. On July 1, Dr. Gasalberti indicated that epidural steroid injections had provided temporary relief. (Id. at 183.) Dr. Gasalberti further noted that Plaintiff was limited in lifting five to ten pounds for no more than one to two hours per day; sitting or standing up to fifteen to twenty minutes, pushing and pulling no more than five to ten pounds. (Id. at 264.)

Dr. Gasalberti's notes from his examinations of Plaintiff on August 16, September 16, October 21 and 28, November 22, and December 23, 2004 remained, for the most part, unchanged from his previous notes regarding Plaintiff's condition. (See id. at 239-45, 259-62.) Plaintiff could flex his trunk to 70 degrees, had paraspinal spasm at L3-4 and L4-5, and had occasional trigger points in the right gluteal maximus muscle. (Id. at 239, 241, 245, 259, 261.) Straight leg raising was negative, and muscle testing in both lower extremities was 5/5. (Id. at 239, 241, 259.) On September 16, 2004, Plaintiff told Dr. Gasalberti that he experienced occasional stiffness and pain when riding his bicycle. (Id. at 259.) Dr. Gasalberti noted mild to moderate improvement in Plaintiff's symptoms following an injection of Lidocaine in the right gluteal medius muscle on October 21, 2004. (Id. at 243, 245.) On October 28, 2004, Dr.

Gasalberti stated that Plaintiff was totally disabled from performing his prior job of lifting and carrying more than twenty pounds, and he could not bend, stoop, twist or kneel. (Id. at 243.) Plaintiff could, however, reach above his shoulders, perform repetitive hand motions, operate equipment, and use tools when sitting. (Id. at 244.) He had difficulty standing and walking and reported that light duty work was not available. (Id.) On November 22, 2004, Dr. Gasalberti indicated that Plaintiff did not evidence any pain or discomfort on deep palpation to the left foot, and ankle motion was unrestricted. (Id. at 241.) Dr. Gasalberti stopped prescribing Celebrex on December 23, 2004, and advised Plaintiff to take Motrin as needed. (See id. at 240.)

Dr. Gasalberti's functional evaluation test on August 24, 2004 indicated the following levels of impairment: right leg 17%, right ankle 17%, left leg 71%, left hip 40%, left knee 17%, left ankle 42%, spine 2%, and lumbar region 2%. (See id. at 224-38, 247-58.) A functional evaluation test on January 4, 2005 indicated the following levels of impairment: whole person 24%; right leg 38%; right hip 25%; right knee 17%; left leg 23%; left knee 12%, left ankle 12%, spine 1%, and lumbar region 1%. (Id. at 224-38.)

Plaintiff did not see Dr. Gasalberti again until April 28, 2005. (Id. at 221-22.) At that time, Dr. Gasalberti noted that Plaintiff's straight leg raising was negative, muscle testing of the lower extremities was 5/5, and Plaintiff could flex his trunk to 80 degrees. (Id. at 221.) Dr. Gasalberti assessed a permanent partial disability to a mild to moderate degree, and stated that Plaintiff could not perform his job as a service technician, where he had to lift up to seventy pounds. (Id. at 222.)

Plaintiff made four subsequent visits to Dr. Gasalberti in 2005, on June 3, September 1, October 4, and November 22. (Id. at 219-20, 305-09.) At all of these visits, Dr. Gasalberti noted that Plaintiff's straight leg raising was negative, muscle testing of the lower extremities was 5/5,

11

and Plaintiff could flex his trunk 70 to 75 degrees and rotate laterally to 15 degrees. (Id. at 219, 305, 307, 309.) Muscle spasms at L3-4 and L4-5 were noted. (Id.) Trigger points in the left paraspinal muscles were noted on October 4, 2005, and Plaintiff was given an epidural injection. (Id. at 307.) Plaintiff was instructed to take Motrin as needed, wear a lumbosacral corset for support, and continue home exercises. (Id. at 309.) According to Dr. Gasalberti, Plaintiff's disability was permanent partial from a mild to moderate degree, and Plaintiff was not working because limited light-duty work was not available. (Id. at 307-08.)

Dr. Gasalberti again examined Plaintiff on February 14, 2006 and indicated that Plaintiff needed to avoid prolonged standing or sitting for more than two to three hours; needed fifteen minute rest periods, could lift fifteen to twenty pounds, sit two to three minutes, stand five to ten minutes, and walk two to three blocks. (Id. at 311.)

Dr. Gasalberti also completed a Medical assessment questionnaire for Plaintiff's Social Security benefits application on February 14, 2006. (Id. at 312-16.) He indicated that Plaintiff could walk one or two blocks before he needed to rest, could sit continuously for less than ten to fifteen minutes, stand for ten to fifteen minutes, and sit, stand and walk less than two hours. (Id. at 314-15.) He also indicated Plaintiff needed to include periods of walking in an eight-hour day – that he needed to walk every five to ten minutes – and he needed a job allowing him to shift positions and take unscheduled ten- to fifteen-minute breaks every hour. (Id. at 314.) Dr. Gasalberti also indicated that Plaintiff could frequently lift and carry items weighing less than ten pounds. (Id. at 315.)

On March 13, 2006, Dr. Gasalberti noted that Plaintiff's X-rays showed no abnormality other than mild degenerative changes of the hips. (Id. at 359.)

Plaintiff's remaining visits with Dr. Gasalberti in 2006 occurred after the period of Plaintiff's claimed disability. (Id. at 277-78, 356-57, 363, 368-69, 373.) Dr. Gasalberti saw Plaintiff on March 30, April 27, May 4, May 8, July 7, and August 3, 2006. (Id.) Plaintiff was given SI joint steroid injections on April 28, May 5, and on May 12, 2006. (Id. at 365, 370, 374-75.) The epidural steroid injections provided moderate overall improvement in Plaintiff's symptoms. (See id. at 361, 371.) On August 3, 2006, Plaintiff reported that he had no lower back pain and had no pain with deep palpation of the lumbosacral spine or SI joints. (Id. at 361.)

During Plaintiff's visits in 2006 after the period of his claimed disability, Dr. Gasalberti continued assessing Plaintiff as having a permanent partial disability from a mild to moderate degree, and advised Plaintiff that he avoid prolong standing or sitting greater than two to three hours, with fifteen-minute rest periods; and lifting of items weighing more than fifteen to twenty pounds. (Id. at 357, 362, 369, 372.) Plaintiff was able to sit continuously two to three minutes, stand five to ten minutes, and walk two to three blocks. (Id. at 357, 362, 369, 372.)

## 2. Consulting Physicians' Opinions

On March 12, 2004, Dr. Joseph Lopez examined Plaintiff at the request of Plaintiff's workers' compensation insurer. (Id. at 349-352.) Dr. Lopez reported that Plaintiff ambulated well in the examining room. (Id. at 351.) He indicated that Plaintiff could extend his lumbar spine to the neutral position, but any type of forward flexion produced pain. (Id. at 352.) He also indicated that Plaintiff could flex forward and touch his mid-thighs, and extend past the neutral position; lateral bending and rotation appeared to be 5 degrees in each plane; and there was tenderness in response to palpation in the paralumbar musculature. (Id.) Dr. Lopez also noted that Plaintiff could raise his straight leg to 60 degrees with pain, and knee-jerk and ankle-jerk reflexes were symmetrical and intact. (Id.) Dr. Lopez indicated that Plaintiff demonstrated

full motion in the hips, knees and ankles. (Id.) Dr. Lopez diagnosed Plaintiff as having a chronic lumbosacral strain and possible left-sided sciatica. (Id.) Dr. Lopez stated that Plaintiff exhibited evidence of a moderate disability, but could not provide a schedule of Plaintiff's loss of use at that time. (Id.) He also noted that Plaintiff could return to a sedentary-type job, with no lifting over twenty-five pounds, and no crawling, squatting, or climbing. (Id.)

On June 8, 2004, Dr. Ernesto D. Seldman performed an independent orthopedic evaluation on Plaintiff for his workers' compensation claim. (Id. at 135-36.) He indicated that Plaintiff felt somewhat better than previously and reported pain in the back and left leg after physical therapy. (Id. at 135.) Dr. Seldman noted that Plaintiff had a normal gait pattern, could walk normally on heels and toes and could mount the examination table easily. (Id.) He indicated Plaintiff's flexion, extension, and right and left lateral bending was limited; vertebral tenderness and paravertebral muscle spasm were present; inversion, eversion, and plantar and dorsal flexion of the ankles were to normal ranges; and the ankle joint was stable. (Id.) Dr. Seldman's diagnosis was residual lumbosacral stiffness, and he indicated that Plaintiff could perform activities of daily living and work light duty, but no lifting over twenty pounds. (Id.)

On July 29, 2004, Dr. Mohammed Khattak, an orthopedic consultative examiner and consultative examiner for the Division of Disability Determinations, evaluated Plaintiff at the request of the state agency. (Id. at 198-200.) He indicated that Plaintiff was ambulating without any assistance. (Id. at 198.) Dr. Khattak also indicated that Plaintiff's gait was steady, sitting and standing were normal, and that Plaintiff could get on and off the examining table without any assistance. (Id.) He also noted that Plaintiff was able to rise on his toes; squat with some difficulty rising form the squatting position due to back pain. (Id.) Dr. Khattak noted that an X-rays of the lumbar spine revealed no acute bony abnormality. (Id. at 199-120.) Dr. Khattak's

diagnosis was degenerative disc disease of the lumbosacral spine. (Id. at 199.) He noted that lumbar spinal stenosis needed to be ruled out. (Id.) Dr. Khattak opined that Plaintiff's ability to stand, walk, lift and carry may be moderately limited, but there were no limitations in sitting or reaching with gross and fine manipulations in his hands and he did not need any assistive devices for ambulation. (Id.)

On September 23, 2004, New York State Agency medical consultant C. Russo completed a Physical Residual Functional Capacity Assessment, indicating that Plaintiff was able to perform light work activity with occasional postural limitations. (Id. at 213-18.)

### D. Non-Medical Evidence at the March 7, 2006 Hearing

At the March 7, 2006 hearing, Plaintiff testified that he could not work due to severe pain caused by the work-related injury to his lower back and left leg, pain in his right leg sometimes, and pain in his hands. (Id. at 419; see also id. at 61, 81, 90.) He described his pain as a pulling, stabbing, and achy pain in his lower back that radiated down his legs and "comes and goes." (Id. at 108, 420, 421; see also id. at 241.) He testified that his left knee sometimes locked up when he was sitting, and that strenuous lifting, moving in the wrong position, doing chores, and sitting down too long would cause pain. (Id. at 420-21.) He could sit for fifteen to twenty minutes before he needed to get up, could walk a block or two before he needed to stop and rest before continuing, and could stand for twenty to thirty minutes. (Id. at 420.) Walking exacerbated his pain, but he could walk about three to four blocks before he needed to rest. (Id. at 421.) He was most comfortable lying down. (Id.) He used a heating pad, and ice and cold packs on days he did not go to physical therapy. (Id. at 421-22.) He went to physical therapy two to three times a week and also saw a chiropractor, Dr. Vendittelli, one to two times a week. (Id. at 422.) Plaintiff had used Vioxx and Celebrex, but at that time took only Motrin and Advil, and only

15

when he felt pain. (Id. at 423-424.) He also used a pain patch almost once a week, which made him feel numb and caused him to misstep. (Id.)

Plaintiff also testified that he had pain in his left ankle and foot when walking too far or when standing too long, and occasionally pulling and stiff pain in his neck radiating to his arms when he would sit up too straight. (Id. at 424-25.) He also had numbness in the fingers of his left hands. (Id. at 425.) Plaintiff testified that he took public transportation for about half an hour to his therapy sessions, but that gave him pain in his back and legs and made him tired. (Id. at 426.) He had to avoid rush hours in order to get a seat on the train or bus. (Id.)

Plaintiff lived with his girlfriend whom he testified did most of the chores. (Id. at 427.) Plaintiff helped her sometimes by sweeping the floor and doing some laundry and cooking. (Id. at 428.) He could dress himself and attend to personal hygiene. (Id.) He testified that he was unable to shop, but indicated in his Disability Report that he shopped for groceries every two weeks. (Id. at 101-03, 427-29.) He also watched television, read books and listens to the radio. (Id. at 101, 104.) He did not go to the movies or do any other social activities. (Id. at 429.)

Plaintiff also testified that he could possibly do a low-stress job where he could alternate between sitting and standing, but that sitting was very "strenuous" for him and he did not think there was a comfortable chair he could sit in that would not cause him any pain. (Id. at 429-30.)

### E. Vocational Expert Testimony

Mr. Rocco Meola, a vocational expert, responded on May 5, 2006 to written interrogatories by the ALJ. (Id. at 317-21.) Mr. Meola classified Plaintiff's past work as skilled and heavy exertionally. (Id. at 318.) Mr. Meola noted that Plaintiff was a younger individual with two years of college. (Id.) When assuming an individual the same age as Plaintiff, having the same education, and ability to perform sedentary work allowing him to alternate sitting and

16

standing when needed, Mr. Meola stated that there were jobs existing in the local and national economies that this individual could do. (Id. at 319.) These jobs included the unskilled sedentary jobs of document preparer, eyeglass frames inspector, and table worker. (Id.) There were aggregate numbers of 2,000 such jobs in the New York Metropolitan area, and in excess of 30,000 such jobs nationally. (Id. at 320.)

Mr. Meola testified at the supplemental administrative hearing on January 8, 2007. (See id. at 396-403.) Plaintiff's counsel asked Mr. Meola to assume an individual with the following restrictions: continuous sitting limiting to ten to fifteen minutes, and two hours total sitting, walking limited to five to ten minutes before needing to rest, standing and walking limited to two hours, and ten to fifteen minutes unscheduled work breaks every hour. (Id. at 400-02.) Mr. Meola testified that this hypothetical individual, if so restricted, could not work as a sedentary level on a continuous basis, and that there would be no jobs that this individual could perform in the national and/or local economies. (Id. at 401-02.)

## II.     DISCUSSION

### A.     Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 398, 401 (1971). A reviewing court should verify that a claimant "has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990). In order to provide a full hearing, an

"ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). Further, the reviewing court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). However, when reviewing the conflicting evidence, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Therefore, the reviewing court may not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon de novo review. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)). Remand for a calculation of benefits without further proceedings is appropriate if the district court has no apparent basis to conclude that a more complete record would support the Commissioner's decision. See, e.g., Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998).

**B.     The ALJ's Decision**

When the Appeals Council denies a claimant's request for review, the decision of the ALJ stands "as the final decision of the Commissioner." 20 C.F.R. §§ 404.981, 416.1481; Perez

v. Chater, 77 F.3d 41, 44 (2d Cir. 1996). To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act. Shaw, 221 F.3d at 131. Agency rules require the Commissioner to apply a five-step sequential analysis to evaluate whether the claimant is disabled. See 20 C.F.R. §§ 416.920, 404.1520. Under that analysis:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).

In the instant decision, the ALJ conducted the five-step analysis and concluded that the Plaintiff was not disabled as defined under the Social Security Act. (Tr. 5R.) When applying the five-step analysis, the ALJ discussed the medical evidence, beginning with the evidence of Plaintiff's treating physician, Dr. Gasalberti, and other treating doctors, including Dr. Vendittelli, a chiropractor; Dr. Das, a neurologist; and Dr. Marini, a pain management specialist. (Id. at 5L-5N.) The ALJ also discussed the opinions of two consulting physicians: Dr. Khattak and Dr. Lopez. (Id. at 5M-5N.) But the ALJ did not discuss the medical evidence of Plaintiff's other treating physicians, including Dr. Martin, a neurologist, and Dr. Manouel, an orthopedist. (Id. at

5H-5K.) Nor did the ALJ discuss the opinion given by Dr. Seldman, a consulting physician. (Id.) The ALJ also did provide a description of Plaintiff's personal and work history, as well as a detailed discussion of Plaintiff's testimony at the hearing. (Id. at 5N-5O.)

ALJ found that Plaintiff met step one, concluding that he had not engaged in substantial gainful activity from October 3, 2003 through March 30, 2006. (Id. at 5J.) The ALJ also found that Plaintiff had the following severe impairments: chronic back pain and lumbar radiculopathy, which satisfied step two. (Id. at 5J-5K.) At step three, the ALJ further found that the Plaintiff did not have impairment or a combination of impairments listed in or equal to those in the Listings of Impairment. (Id. at 5K-5L.) At step four, in contrast to the New York State Agency medical consultant's conclusion that Plaintiff retained the residual functional capacity ("RFC") for light work, the ALJ found that Plaintiff had the RFC to perform sedentary work at a job that would allow him to alternate sitting and standing at his election. (Id. at 5Q.) Accordingly, the ALJ found that Plaintiff could not perform any past relevant work which was heavy work. (Id.) Finally, the ALJ evaluated the vocational expert's testimony and found that Plaintiff, based on his RFC and his age, education, and work experience, was able to perform jobs as a document preparer, inspector for eyeglass frames, and table worker, jobs that existed in the national economy. (Id.)

In reaching these findings, the ALJ accorded "no significant weight" to Dr. Gasalberti's "declaration of disability" given in the assessment report dated February 14, 2006. (Id.) The ALJ opined that Dr. Gasalberti's "assessment is not supported by his own findings," but the ALJ did not cite any of Dr. Gasalberti's treatment records. (Id.) The ALJ also noted that Dr. Gasalberti's assessment of Plaintiff's capacities was also inconsistent with the weight of the medical evidence, citing Dr. Lopez's and Chiropractor Dr. Vendittelli's opinions that Plaintiff

20

could return to a sedentary-type job, and Dr. Das's opinion that Plaintiff improved after the steroid injections; the ALJ gave more weight to these opinions than to Dr. Gasalberti's February 14, 2006 opinion. (Id. at 5N.) Furthermore, viewing Dr. Gasalberti's February 14, 2006 opinion to be a declaration of disability, the ALJ opined that the finding of disability is an issue reserved for the Commissioner. (Id. at 5Q.)

In addition, ALJ found that Plaintiff's daily life had not been significantly affected by his claimed disability, and discounted Plaintiff's complaints of pain as far in excess of what could reasonably be expected from Plaintiff's activities of daily living, medical condition, and the objective medical evidence. (Id. at 5P.) The ALJ thus concluded that Plaintiff was not disabled and retained the residual functional capacity to perform full range of sedentary work. (Id. at 5R.)

## C.    The Parties' Claims

Plaintiff claims that the ALJ's findings are not supported by substantial evidence, contending that the ALJ failed to properly evaluate the medical evidence and to properly apply the treating physician rule. (See Pl. Mem. 14-17.) In addition, Plaintiff claims that the ALJ improperly rejected the credibility of his complaints of pain and description of his limitations. (Id. at 17-19.) Plaintiff seeks reversal of the ALJ's decision and a remand solely for the calculation of benefits. (Id. at 3.) In the alternative, Plaintiff requests a remand for further development and proper evaluation of the record. (Id.) Defendant claims that the Commissioner's decision is supported by substantial evidence in the record and is based upon the application of correct legal standards. (Def. Mem. 1.)

## D.    The Treating Physician Rule

Plaintiff claims that ALJ failed to give controlling weight to Dr. Gasalberti's February 14, 2006 report.  Plaintiff claims that Dr. Gasalberti's findings of limitation in Plaintiff's capacities are equivalent to an RFC less than the level of sedentary work.[2]

The district court's role is not to weigh the credibility of complex, contradictory evidence, or reconsider anew whether a claimant is disabled.  See Schaal v. Apfel, 134 F.3d 496, 500 (2d Cir. 1998); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004).  But the district court must nonetheless ensure that the ALJ has faithfully fulfilled his or her legal duties. (Id.)  The ALJ is required to give controlling weight to a treating physician's opinion if it is well supported by medically acceptable clinical and laboratory diagnostic and is not inconsistent with the other substantial evidence.  20 C.F.R. § § 404.1527(d)(2), 416.927(d)(2); see Shaw, 221 F.3d at 134.

Before declining to give the treating physician's opinion controlling weight, the ALJ must consider the following factors: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.  Shaw, 221 F.3d at 134.  In addition, the regulations provide that the agency "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion."  20 C.F.R. § § 404.1527(d)(2), 416.927(d)(2); see Shaw, 221 F.3d at 134.

---

[2] A sedentary level of RFC requires that a claimant can perform "up to two hours of standing or walking and six hours of sitting in an eight-hour work day."  Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000).

Certain determinations, however, are reserved to the Commissioner, including the determination that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1).

In the instant case, the ALJ did not accord controlling weight to Dr. Gasalberti's February 14, 2006 opinion with respect to the limitations of Plaintiff's capacities, and failed to properly consider the factors under 20 C.F.R. § 404.1527(d)(2) before doing so. Accordingly, the case must be remanded for consideration of those standards.

First, the ALJ failed to consider all of the factors that are required when not affording controlling weight to a treating physician's opinion. The ALJ failed to give weight to the length and frequency of the relationship the Plaintiff had with Dr. Gasalberti, who had been treating Plaintiff throughout the period at issue and usually saw him at least once per month during that period. See Sutherland, 322 F. Supp. 2d at 290. The ALJ also failed to mention the medical evidence in support of Dr. Gasalberti's opinion. Dr. Gasalberti's treatment reports indicate a restricted range of motion to 70 degrees, that deep palpation revealed paraspinal spasms at L4-5 and L5-S1, Plaintiff's inability to flex his trunk due to pain, and trigger points of the gluteal maximus muscle. (See id. at 124-127; 123; 121; 184, 273, 239, 241, 245, 259, 261.) MRI results supported Dr. Gasalberti's finding. (Id. at 153-154.) From EMG and nerve conduction studies, Dr. Gasalberti also found radiculopathy involving the L4-5 and L5-S1 motor roots on the left side. (Id. at 120.) X-rays showed a small plantar calcaneal spur on the Plaintiff's left foot. (Id. at 119, 150.)

Treating records of other doctors also supported Dr. Gasalberti's findings. Dr. Das indicated that Plaintiff had spasm in the lumbar region, his range of motion was diminished in flexion and extension, and his pain increased when he reached greater than 60 degrees of flexion and 10 degrees of extension. (Id. at 272.) Dr. Vendittelli noted that palpation and percussion

23

were positive at spinal levels L4 and L5, and lumbosacral spine impairment was positive. (Id. at 173.) Dr. Manouel indicated that Plaintiff had pain in response to palpation over the plantar aspect of the heel and mildly decreased range of motion of the ankle, and fibrotic band along the left arch of the left foot. (Id. at 128.) Dr. Marini noted that Plaintiff ambulated with a mildly flexed gait. (Id. at 196.) Dr. Marini opined that Plaintiff had lumbosacral L3–4 left posterior disc herniation with radiculitis. (Id.)

Second, the ALJ failed to provide "good reasons" for discrediting Dr. Gasalberti's opinion, as 20 C.F.R. § 404.1527(c)(1) requires. The ALJ opined that Dr. Gasalberti's assessment was not supported by Dr. Gasalberti's own findings, but failed to give explanations for that finding. (Id. at 5N.) In addition, the ALJ's citation to Social Security Rulings 96-5P, which provides that the finding of disability is an issue reserved for the Commissioner, is not relevant, because Dr. Gasalberti did not make a "declaration of disability" in his assessment report. Rather, he described the limitation in Plaintiff's sitting (less than two hours) and standing (less than two hours) in an eight-hour work day. (Id. at 314-15.) Such statements are not a "declaration of disability" within the meaning of Social Security Rulings 96-5P such as "unable to work."

Third, the opinions of Dr. Lopez, Dr. Vendittelli, and Dr. Das do not constitute the "substantial evidence" that is necessary to deny controlling weight to Dr. Gasalberti's opinion.[3] The ALJ relied on Dr. Lopez, a consulting physician who examined Plaintiff once and opined that Plaintiff could return to a sedentary-type job with no lifting over twenty-five pounds, and no crawling, squatting, or climbing. (Id. at 5N.) The Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the "consulting physician's opinions or report should be given limited weight." Cruz v. Sullivan, 912 F.2d 8, 13

---

[3] As discussed separately infra, it is unclear how much weight the ALJ gave to Dr. Khattak's opinion. (Tr. 5M.)

(2d Cir. 1990). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Id. at 13 (citations omitted). Additionally, consultative reports often ignore or give only passing consideration to subjective symptoms without stated reasons. See id. "The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence." Simmons v. United States R.R. Ret. Bd., 982 F.2d 49, 55 (2d Cir. 1992) (reversing administrative decision that relied on one consulting physician's opinion who examined the plaintiff once without the benefits of two CT scans). In the present case, Dr. Lopez examined Plaintiff only one time, and the record indicates that Dr. Lopez did not review either the MRI of the lumbosacral spine or the EMG testing. (See Tr. 349-352.) Therefore, the ALJ should have given only limited weight to Dr. Lopez's findings.

The ALJ also cited the opinion of Dr. Vendittelli, a chiropractor, that Plaintiff could lift twenty pounds occasionally, sit for up to eight hours in an eight-hour workday, stand and walk for up to two hours in an eight-hour workday and push and pull twenty pounds to discount Dr. Gasalberti's February 14, 2006 assessment report. A chiropractor's opinion is "not a medical opinion" under the regulations, however. Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). As a result, a chiropractor's opinion is not considered a treating physician's opinion and is not entitled to controlling weight. Id. at 314. In addition, Dr. Lopez did not mention any restriction to Plaintiff's sitting at all, whereas Dr. Vendittelli opined that Plaintiff needed to alternate between sitting and standing. Where there are discrepancies between the two reports, there is "thus no basis for ALJ to conclude that either intended to provide a full accounting of the [plaintiff]'s physical impairments. See Rosa v. Callahan, 168 F.3d 72, 81 (2d Cir. 1999).

Fourth, the ALJ improperly characterized the fact that Dr. Gasalberti recommended only conservative treatment as evidence that Plaintiff was not disabled. By doing so, the ALJ "imposed his notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered." See Shaw, 221 F.3d at 134-35. The ALJ is not permitted to substitute his or her own expertise or view of the medical proof for the treating physician's opinion. See Balsamo, 142 F.3d at 81.

In sum, the ALJ did not rely on substantial evidence to justify his decision that Plaintiff retained the residual functional capacity to meet the demands of sedentary work and was thus not disabled. A remand is needed for proper evaluation of the record in accordance with the treating physician rule.

### E.    Plaintiff's Credibility

Plaintiff also asserts that the ALJ failed to properly consider Plaintiff's subjective complaints of pain and the effects of pain medication. (Pl. Mem. 17.)

Under appropriate circumstances, the subjective experience of pain can support a finding of disability. See Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983). The ALJ must make credibility findings where there is conflicting evidence about a claimant's pain. Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Donato v. Secretary of Health & Hum. Servs., 721 F.2d 414, 418-19 (2d Cir. 1983). The ALJ's independent judgment about a claimant's testimony "should be arrived at in light of all the evidence . . . ." Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983). Because the ALJ has discretion to evaluate the claimant's credibility in this regard, "[i]f the ALJ's decision to ignore plaintiff's subjective complaints of pain is supported by substantial evidence, then [the federal court] must uphold that determination." Moscoso v. Astrue, No. 08-CV-4734 (JG), 2009 WL 1605547, at *5 (E.D.N.Y. June 9, 2009) (quotation marks and citation

omitted). Substantial evidence of subjective pain may be found in "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." Snell, 177 F.3d at 135 (quoting 20 C.F.R. § 404.1529(a)).

Where a claimant's subjective complaints of symptoms exceed the restrictions that can be demonstrated by objective medical evidence, the ALJ must examine additional factors, including: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating or aggravating factors; (4) type, dosage, effectiveness, and adverse side-effects of medication that the claimant has taken to alleviate her symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; and (6) any measures which the claimant uses or has used to relieve her pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); Social Security Ruling 96-7p.

The Second Circuit has frequently rejected an ALJ's discrediting of a plaintiff's credibility when the credibility determination was based on only one or two factors. See, e.g., Balsamo, 142 F.3d at 81-82 (rejecting credibility determination where the ALJ only considered the plaintiff's minimal activities of daily life). However, a remand may not be necessary in every case where there are not explicit findings on all seven factors. Sarchese v. Barnhart, No. 01-CV-2172 (JG), 2002 WL 1732802, at *9 (E.D.N.Y., July 19, 2002).

In this case, Plaintiff testified at the hearing that he had severe pain in his lower back and left leg, pain in his hands, and that he sometimes had pain in his right leg. (Tr. 419.) He also testified that due to his pain he could not sit for more than fifteen to twenty minutes or stand for more than twenty to thirty minutes, and he could only walk for one or two blocks before he needed to take a rest. (Id. at 420-21.) The ALJ opined that Plaintiff's "statements concerning

27

the intensity, persistence and limiting effect of [his claimed] symptoms are not entirely credible." (Id. at 5P.)

In reaching his finding, the ALJ gave explicit assessment of most, if not all of the seven factors listed in the regulation. (See id. at 5P-5Q.) The ALJ noted that Plaintiff was able to prepare his own meals, do light housework, shop, attend therapy three times a week, independently maintain his self care, use public transportation, and go out alone. (Id. at 5P.) The ALJ also noted that Plaintiff's treatment was conservative, and he never required any narcotic pain medications and took Motrin for pain, which was advised only "as needed," which implies a lesser level and degree of pain. (Id.) The ALJ also considered that the primary treating physician, Dr. Gasalberti, noted improvement in Plaintiff's back pain after epidural steroid injections. (Id. at 5P.) In addition, the ALJ noted Plaintiff's reports to Dr. Gasalberti that he was medically cleared to work at light duty but that his company did not provide this opportunity. (Id.)

The records of Plaintiff's treatment with Dr. Gasalberti and other doctors also supported the ALJ's credibility determination. Dr. Gasalberti reported on April 1, 2004 that Plaintiff was independent in all activities of daily living. (See id. at 299.) The records also showed that Plaintiff, for the most part, denied any medication side effects. (Id. at 424.) According to Dr. Gasalberti, Plaintiff's symptoms seldom interfered with his attention or concentration and he had no limits with work stress. (Id. at 313.) This court finds ALJ's credibility assessment is supported by substantial evidence.

**F.    Dr. Khattak's Consultative Opinion**

Plaintiff also claims that it is unclear what weight the ALJ gave to Dr. Khattak's opinion, which indicated that Plaintiff had no limits in sitting. (Pl. Mem. 8.) Plaintiff also argues that it is

unclear from the record whether Dr. Khattak reviewed the MRIs and the EMG prior to providing his opinion, and thus that his findings are not supported by medical evidence. (Id.) In <u>Lamar v. Barnhart</u>, 373 F. Supp. 2d 169 (E.D.N.Y. 2005), this court described one of Dr. Khattak's reports as "slipshod and specious" and "question[ed] the state's continued reliance on Dr. Khattak's 'medical' opinions." Id. at 177. In addition, this court directed that the Commissioner forward a copy of <u>Lamar</u> to the appropriate New York State authorities to take appropriate action. Id.

In the instant case, the ALJ introduced Dr. Khattak's opinion along with other medical evidence, but there is no indication as to how much weight he gave to this opinion. (See Tr. 5M-5Q.) The ALJ did not discredit the opinion when he found that Plaintiff had some limits in sitting and required alternation in sitting and standing, which is inconsistent with Dr. Khattak's finding that Plaintiff had no limits in sitting. (Id. at 5M.) Nor is it clear whether the ALJ relied on Dr. Khattak's evaluation as additional evidence to discredit the opinion of treating physician Dr. Gasalberti that Plaintiff had limitations in sitting that were equivalent to an RFC of less than sedentary work, when he referenced the evaluations of Dr. Lopez, Dr. Das, and Dr. Vendittelli supporting his finding. (Id. at 5N.) Therefore, a remand is needed to clarify the weight the ALJ gives to Dr. Khattak's opinion.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motion is denied. Plaintiff's Motion is granted to the extent that the case is remanded for further proceedings in accordance with this Memorandum and Order.

SO ORDERED.

s/ NGG

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
     July 31, 2009                      United States District Judge